**Keith Altman (SBN 257309)**
**Lento Law Group P.C.**
**3000 Atrium Way - Suite #200**
**Mt. Laurel, New Jersey 08054**
**(516) 456-5885**
**kaltman@lentolawgroup.com**

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **AMBASSADOR MARC GINSBERG AND THE COALITION FOR A SAFER WEB** | **CASE NO:** |
| **Plaintiffs,** | **COMPLAINT FOR DAMAGES** |
| **v.** | |
| **GOOGLE, INC.** | <u>**JURY TRIAL DEMANDED**</u> |
| **Defendant** | |

**NOW COME PLAINTIFFS AMBASSADOR MARC GINSBERG AND THE COALITION FOR A SAFER WEB BY, AND THROUGH THEIR ATTORNEYS KEITH ALTMAN OF LENTO LAW GROUP, STATE AS FOLLOWS:**

## INTRODUCTION

1.      This is a lawsuit seeking damages and injunctive relief against Defendant Google, Inc. for allowing Telegram to be made available through Google's Google Play Store, despite Google's knowledge that Telegram is being used to intimidate, threaten, and coerce members of the public.

2.      Google has clearly defined policies and guidelines prohibiting applications such as Telegram from being used in such a manner yet chooses not to enforce those policies and guidelines.

3.      As a result, consumers, like Plaintiff Ambassador Marc Ginsberg, a member of one of the groups targeted by Telegram's users, have suffered economic losses in addition to emotional distress.

## PARTIES

4.      Plaintiff Ambassador Marc Ginsberg ("Ambassador Ginsberg") is a citizen of the State of Maryland and is the owner of a Samsung Galaxy Express, which he obtained for personal and professional use on May 5, 2013. As part of his purchase of the Samsung Galaxy Express, Ambassador Ginsberg knew that Google, inc., had an Application Store known as the Google Play Store where various third-

party application developers could make their applications available to users. Ambassador Ginsberg further knew that Google had terms of service and policies related to the use of the applications available through the Google Play Store. Ambassador Ginsberg relied on Google to comply with its policies and terms of service when deciding to purchase his Samsung Galaxy Express.

5.      Ambassador Ginsberg has had a career that has placed him in the public spotlight numerous times through his work as a White House liaison for the Secretary of State, as a Deputy Senior Advisor to the President for Middle East Policy, as a United States Ambassador to Morocco, and for his numerous appearances in U.S. and global publications and news shows.

6.      Ambassador Ginsberg was raised in Israel and has addressed Jewish groups in the United States and throughout the Arab world on the importance of Judaism and Israel. Ambassador Ginsberg has been a member of and involved with the Beth El synagogue in Bethesda, Maryland for decades and other synagogues in Montgomery County, Maryland.

7.      As the first Jewish ambassador to an Arab country from the U.S., Ambassador Ginsberg has been subjected to two assassination attempts due to his religious beliefs held as a United States Ambassador.

8.      Ambassador Ginsberg created the Coalition for a Safer Web to compel social media platforms to end their tolerance of anti-Semitism and their enabling of extremist groups to operate with impunity over social media.

9.     Plaintiff Coalition for a Safer Web ("CSW") is a 501(c)(3) organization with its principal place of business located in Washington, D.C. CSW employs Ambassador Ginsberg and reimburses him for his professional use of his Samsung Galaxy Express.

10.     Defendant Google, Inc. ("Google") is a California corporation headquartered in Mountain View, California, and has its principal place of business in California. At all times relevant to this action, Defendant Google was directly engaged, and is currently engaged, with the marketing, promotion, management, and distribution of apps in their Google Play Store and the business of marketing, promoting, distributing, and selling smartphones and computers within California and across the United States. Defendant Google did so with the reasonable expectation that their products and apps would be used across the United States.

## JURISDICTION AND VENUE

11.     Defendant Google is a California corporation, headquartered in Mountain View, California, and has its principal place of business in California.

12.     At all times relevant to this action, Defendant Google was directly engaged, and is currently engaged, with the marketing, promotion, management, and distribution of applications on the Google Play Store and the business of marketing, promoting, distributing, and selling products such as Android smartphones, tablets, smartwatches, and computers within California and across the United States with the

reasonable expectation that their products and apps would be used across in the United States.

13.     Plaintiff Marc Ginsberg ("Ambassador Ginsberg") is a citizen of the state of Maryland and is the owner of a Samsung Android smartphone, which he obtained for personal and professional use.  Ambassador Ginsberg has suffered damages through his purchase of his Samsung and is suffering from negligent infliction of emotional distress in an amount that exceeds $75,000.  Furthermore, Ambassador Ginsberg seeks to enjoin Google from allowing Telegram to be available in the Google Play Store in violation of Google's policies and terms of service.

14.     Plaintiff Coalition for a Safer Web ("CSW") is a 501(c)(3) organization with its principal place of business in Washington, D.C., and is responsible for reimbursing Ambassador Ginsberg for his use of his Samsung for business use. At this time, these costs are being accrued by CSW, and Ambassador Ginsberg must use his own money to pay the bill while he awaits reimbursement.

15.     Jurisdiction in federal court is proper pursuant to 28 U.S.C. § 1332 as Plaintiffs Ambassador Ginsberg and CSW are citizens of different states as Defendant Google and the amount in controversy exceeds $75,000.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 as Defendant may be found in or transacts business in this district and a substantial part of the events giving rise to Plaintiffs' claims occurred and continue to occur in this district.

## FACTS CONCERNING DEFENDANT GOOGLE, INC.

18. On July 11, 2005, Google purchased Android, an operating system for smartphones.[1]

19. On March 6, 2012, Google launched the Google Play Store, available on all Android devices, including Ambassador Ginsberg's device.[2]

20. In 2019, Google sold an estimated 7.2 million smartphones.[3]

21. It is estimated that, as of 2020, there are 127.8 million Android smartphone users in the United States, and that number has increased to 130.6 million in 2021.[4]

22. Since 2015, Samsung smartphones, which are supported by the Android operating system and offer the Google Play Store, have been priced anywhere from $399+ to $1999+.[5]

---

[1] Google's Acquisition of Android: https://www.androidauthority.com/google-android-acquisition-884194/
[2] History of Google Play Store: https://www.androidauthority.com/android-market-google-play-history-754989/
[3] Google Sales: https://arstechnica.com/gadgets/2020/06/idc-google-outsells-oneplus-with-7-2-million-pixel-smartphones-in-2019/
[4] Android Smartphone Users: https://www.statista.com/statistics/232786/forecast-of-andrioid-users-in-the-us/
[5] Samsung Prices: https://www.androidauthority.com/samsung-galaxy-s-prices-1192063/

23.    In 2019, Google sold 17 million Google Chromebooks globally, which was estimated to have increased to 20 million in 2020.[6]

24.    Google Chromebooks are priced anywhere from $200+ to $649+.[7]

25.    One of the principal reasons why consumers such as Ambassador Ginsberg purchase Google products is because of the Google Play Store and the apps contained therein.

26.    Google has established terms of use and development guidelines for the use of their products and the Google Play Store.  Consumers, such as Ambassador Ginsberg, are expected to comply with the terms of service and guidelines.  Furthermore, as part of their purchase and use of Google products, consumers such as Ambassador Ginsberg are entitled to reasonably rely on Google to comply with its own policies and guidelines.

27.    In particular, Google requires that applications such as Telegram must go through a review process and comply with specific guidelines before becoming available on the Google Play Store.  Google publishes these review guidelines[8].  *See* Exhibit "A."

28.    Specifically, concerning the Telegram application, Google has allowed Telegram to be distributed through the Google Play Store knowing that Telegram (1)

_____

[6] ChromeBook Sales: https://www.statista.com/statistics/749890/worldwide-chromebook-unit-shipments/
[7] ChromeBook Prices: https://www.laptopmag.com/articles/chromebook-buying-advice
[8] Google Developer Program Policy: https://support.google.com/googleplay/android-developer/answer/10355942?hl=en&visit_id=637470329267552178-2461642293&rd=1

does not comply with Google's developer guidelines and (2) that Telegram is routinely used to violate California's hate speech law, California Penal Code § 422.6.

## FACTS CONCERNING TELEGRAM

29.   Telegram was founded by CEO Pavel Durov and is currently based in Dubai after leaving Russia, Berlin, London, and Singapore due to local IT regulations.[9]

30.   Defendant Google allows the Telegram Messenger app access to its App Store.  On Defendant Google's Google Play Store, the Telegram Messenger app has 6,899,400 total reviews with an average 4.5-star average rating.[10]

31.   Defendant Google allows the Telegram Messenger app to be downloaded for smartphones and Chromebooks.[11]

32.   As of May 2020, the Telegram Messenger app has been downloaded on the Google Play Store an estimated 500 million times worldwide.[12]

On Defendant **Google's Google Play Store** Preview, the Telegram Messenger app is advertised as follows:

- Pure instant messaging — simple, fast, secure, and synced across all your devices. Over 400 million active users.

---

[9] About Telegram: https://www.rbth.com/science-and-tech/333299-all-you-need-to-know-about-telegram
[10] Telegram Google Play Preview:
https://play.google.com/store/apps/details?id=org.telegram.messenger&hl=en_US&gl=UShttps://play.google.com/store/apps/details?id=org.telegram.messenger&hl=en_US&gl=US
[11] *Id.* [Reviews]
[12] About Telegram: https://www.rbth.com/science-and-tech/333299-all-you-need-to-know-about-telegram

- FAST: Telegram is the fastest messaging app on the market, connecting people via a unique, distributed network of data centers around the globe.
- SYNCED: You can access your messages from all your devices at once. Start typing on your phone and finish the message from your tablet or laptop. Never lose your data again.
- UNLIMITED: You can send media and files, without any limits on their type and size. Your entire chat history will require no disk space on your device, and will be securely stored in the Telegram cloud for as long as you need it.
- SECURE: We made it our mission to provide the best security combined with ease of use. Everything on Telegram, including chats, groups, media, etc. is encrypted using a combination of 256-bit symmetric AES encryption, 2048-bit RSA encryption, and Diffie–Hellman secure key exchange.
- POWERFUL: You can create group chats for up to 200,000 members, share large videos, documents of any type (.DOCX, .MP3, .ZIP, etc.), and even set up bots for specific tasks. It's the perfect tool for hosting online communities and coordinating teamwork.
- RELIABLE: Built to deliver your messages in the minimum bytes possible, Telegram is the most reliable messaging system ever made. It works even on the weakest mobile connections.
- FUN: Telegram has powerful photo and video editing tools and an open sticker/GIF platform to cater to all your expressive needs.
- SIMPLE: While providing an unprecedented array of features, we are taking great care to keep the interface clean. With its minimalist design, Telegram is lean and easy to use.

- 100% FREE & NO ADS: Telegram is free and will always be free. We are not going to sell ads or introduce subscription fees.

- PRIVATE: We take your privacy seriously and will never give third parties access to your data. For those interested in maximum privacy, Telegram offers Secret Chats. Secret Chat messages can be programmed to self-destruct automatically from both participating devices. This way you can send all types of disappearing content — messages, photos, videos, and even files. Secret Chats use end-to-end encryption to ensure that a message can only be read by its intended recipient.

- We keep expanding the boundaries of what you can do with a messaging app. Don't wait years for older messengers to catch up with Telegram — join the revolution today.[13]

33.     According to Telegram's website, "Telegram is a cloud-based mobile and desktop messaging app with a focus on security and speed."[14] Further, as per their website, Telegram claims to:

- Be "so simple you already know how to use it."
- Have messages that are heavily encrypted that "can self-destruct."
- Allow users to access chats from multiple devices.
- Deliver messages "faster than any other application."
- Have no limits on the size of user's media and chats.
- Keep messages safe from "hacker attacks."
- Allow groups that can hold up to 200,000 members.[15]

34.     In addition to creating groups for up to 200,000 people, Telegram allows users to create channels to broadcast to unlimited audiences.[16]

35.     Telegram claims to be "for everyone who wants fast and reliable messaging and calls" and allows users to create "[p]ublic groups [that] can be joined by anyone and are powerful platforms for discussions and collecting feedback."[17]

36.     Telegram allows users to "share an unlimited number of photos, videos and files (doc, zip, mp3, etc.) of up to 2 GB each."[18]

---

[13]Google Play Store Preview:
https://play.google.com/store/apps/details?id=org.telegram.messenger&hl=en_US&gl=US
[14] Telegram Website: Telegram.org
[15] *Id.* [telegram home]
[16] *Id.* [FAQs]
[17] *Id.* [FAQs]
[18] *Id.* [FAQs]

37.     Telegram draws many users who use their devices and Telegram's services to promote and/or engage in illegal activity. In fact, Telegram's FAQ includes the following language:

> Q:     There's illegal content on Telegram. How do I take it down?
>
> A:     All Telegram chats and group chats are private amongst their participants. We do not process any requests related to them.[19]

38.     Additionally, in response to the question "[w]hat are your thoughts on internet privacy?" Telegram's FAQ states, in pertinent part:

> - At Telegram we think that the two most important components of Internet privacy should be instead:
>   - Protecting your private conversations from snooping third parties, such as officials, employers, etc.
>   - Protecting your personal data from third parties, such as marketers, advertisers, etc.
> - This is what everybody should care about, and these are some of our top priorities. Telegram's aim is to create a truly free messenger, without the usual caveats.[20]

39.     Telegram FAQs claims the following in response to a question regarding third-party takedown requests:

> "Our mission is to provide a secure means of communication that works everywhere on the planet. To do this in the places where it is most needed (and to continue distributing Telegram through the App Store and Google Play), we have to process legitimate requests to take down illegal *public* content (e.g., sticker sets, bots, and channels) within the app. For example, we can take

---

[19] *Id.* [FAQs]
[20] *Id.* [FAQs]

down sticker sets that violate intellectual property rights or porn bots." (emphasis added)

"Please note that this does not apply to local restrictions on freedom of speech. For example, if criticizing the government is illegal in some country, Telegram won't be a part of such politically motivated censorship. This goes against our founders' principles. While we do block terrorist (e.g. ISIS-related) *bots and channels*, we will not block anybody who peacefully expresses alternative opinions."[21] (emphasis added)

40.     While the above information applies to public channels, such information does not apply to private groups containing upwards of 200,000 individuals. As for this data, Telegram provides the following information:

- Secret chats use end-to-end encryption, thanks to which we don't have any data to disclose.
- To protect the data that is not covered by end-to-end encryption, Telegram uses a distributed infrastructure. Cloud chat data is stored in multiple data centers around the globe that are controlled by different legal entities spread across different jurisdictions. The relevant decryption keys are split into parts and are never kept in the same place as the data they protect. As a result, several court orders from different jurisdictions are required to force us to give up any data.
- Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on people's privacy and freedom of expression. Telegram can be forced to give up data only if an issue is grave and universal enough to pass the scrutiny of several different legal systems around the world.
- To this day, we have disclosed 0 bytes of user data to third parties, including governments.
- Telegram groups are ideal for sharing stuff with friends and family or collaboration in small teams. But groups can also grow very large and support communities of up to 200,000

---

[21] *Id.* [FAQs]

members. You can make any group public, toggle persistent history to control whether or not new members have access to earlier messages and appoint administrators with granular privileges. You can also pin important messages to the top of the screen so that all members can see them, including those who have just joined.

• Channels are a tool for broadcasting messages to large audiences. In fact, a channel can have an unlimited number of subscribers.[22]

41.     Since its launch in 2013, Telegram has been ridiculed for facilitating voices of violence and extremism.

42.     Most recently, in the wake of George Floyd's killing, Telegram has played an essential role in threatening, encouraging, and coordinating racist and anti-Semitic violence.

43.     CSW issued several press releases bringing the real and imminent dangers of Telegram to the attention of Google.

44.     On June 3, 2020, CSW issued a press release, revealing a torrent of extremist incitement, notably anti-Semitic and anti-African American content on Telegram, stemming from white supremacist/ Neo-Nazi communications in the wake of the George Floyd murder and the resulting global protests.[23]

45.     The CSW uncovered encrypted capacity by extremist fringe groups to direct violence, including looting, where police presence is minimal.

---

[22] *Id.* [FAQs]
[23]June 03, 2020 – CSW Demands Action Against the TELEGRAM White Nationalist/Anti-Semitic/Anti-Black Riot Incitement App.

46.     On June 18, CSW issued a second Telegram related press release demonstrating representational evidence that Telegram served as a communications channel for the Russian government and affiliated Neo-Nazi and white nationalist groups, sowing misinformation and racial division in the United States and Europe to provoke African American-on-Jew violence.[24]

47.     Further on July 30, 2020, Ambassador Ginsberg sent on behalf of CSW a letter to Sundar Pichai, CEO of Google, calling on Google to (temporarily) de-platform the Telegram app from Google's Play Store, reiterating the seriousness of Telegram's role in inciting extremist violence. [25] *See* Exhibit "B"

48.     Telegram is currently the most utilized messaging app among extremists who are promoting violence in the United States.   Telegram has been deemed "extremists' app of choice" by POLITICO.[26]

49.     For years, anti-black and anti-Semitic groups have openly utilized Telegram with little or no content moderation by Telegram's management. Despite warnings from CSW and other organizations, extensive media coverage, legal warnings, and other attention that Google is providing an online social media platform and communication service to hate groups, Google has not taken any action

---

[24] June 18, 2020- TELEGRAM App is the Misinformation "Super Spreader" to Foment U.S. Racial Division & Violence.
[25] June 24, 2020- TELEGRAM APP'S ROLE INCITING EXTREMIST VIOLENCE
[26] Alexandra S. Levine, "Telegram Surfaces as Preferred app of Extremist Rioters," *Politico* (June 4, 2020), https://www.politico.com/newsletters/morning-tech/2020/06/04/telegram-surfaces-as-preferred-app-of-extremist-rioters-788230

against Telegram comparable to the action it has taken against Parler to compel Telegram to improve its content moderation policies.

50.     Speech that carries a credible threat of violence against a person or a group based on race or religion is a criminal offense in California.  *See* California Penal Code § 422.6.

51.     Telegram promotes extremist conduct in violation of both state and federal law.

52.     Telegram currently serves as the preferred Neo-Nazi/white nationalist communications channel, fanning anti-Semitic and anti-black incitement during the current wave of protests across America.

53.     Telegram continues to enable extremist incitement in its platform, promoting political violence as extremist groups and individuals migrate to Telegram following Google Play's suspension of Parler.

54.     Telegram has and continues to be used as a channel to cultivate and maintain an image of brutality and to instill great fear and intimidation by disseminating videos and images of numerous threats to kill, images depicting and encouraging racist and anti-semantic violence, and dehumanizing certain groups of people.

55.     In the wake of the murder of George Floyd, these abhorrent postings inciting and encouraging violence have become more frequent, explicitly threatening people of color and Jewish people.

56.     On September 28, 2020, a telegram user under the account name "N**** and Heeb Crime Report" posted a photo of a woman holding a sign that reads "Kill Black People."



57.     The same account also posted the below image of a well-known climate change activist photoshopped to appear to be holding a sign that reads "Kill all n****** for climate."



58.    Further, the same account posted an image (inserted below) depicting a white man next to a dead and dismembered African American person with a caption that reads "The only thing n****** understand are pain and fear."



59.    In addition to racist posts encouraging and violence against African American people, there are also anti-Semitic posts used to threaten and promote violence against people of the Jewish faith.

1
2
3

     60.     Below are some examples of anti-Sematic postings encouraging and, in some cases, directly threatening violence against Jews:

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10



11
12      61.     Telegram further engaged in the facilitation of anti-Semitic and anti-
13
black extremism and violence during the Black Lives Matter ("BLM") protests
14
throughout the summer of 2020.
15
16      62.     Telegram has been used to cultivate and maintain an image of brutality,
17
to instill great fear and intimidation by posting images and videos encouraging racist
18
and anti-Semitic killings.
19
20      63.     Telegram's media platform and services provide tremendous utility and
21
value to racist and anti-Semitic groups as a tool to connect its members and to
22
facilitate these group's ability to communicate, recruit members, plan and carry out
23
attacks, and strike fear in its enemies.
24
25      64.     These have groups relied on Telegram as an essential tool to facilitate
26
and carry out their terrorist activity, including the United States Capital attack on
27
January 6, 2021.
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

65.    Telegram was used to coordinate and incite extreme violence before the inauguration of President-Elect Joe Biden on January 17, 2021.  Some users called on followers to abandon plans for a second protest in Washington in favor of surprise attacks nationwide.[27]

66.    One Telegram message on a far-right channel called "Boogaloo Intel Drop" told followers to "get a feel for your local area and get your friends together." The message encouraged other Telegram users to find others who are outraged about the death of Ashli Babbitt, who was shot by a police officer while storming the Capitol. The posting further read: "No, we're not going to tell you 'show up on XX day and do XX,' which would risk alerting authorities," the message continues, advising followers to "have some damn ingenuity and autonomy."[28]

67.    The following image contains a caption that reads: "When democracy is destroyed: refuse to be silenced; armed march on Capitol Hill & all state capitals. January 17th, 2021 @ 12:00pm"

//

//

//

//

//

---

[27] https://www.washingtonpost.com/national-security/far-right-violent-plans-inauguration/2021/01/14/15668f16-567d-11eb-a817-e5e7f8a406d6_story.html
[28] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13



14    68.    In this case, Telegram is being used to threaten the United States

15   Government specifically.

16

17    69.    In addition to postings to incite violence and spread hate, Telegram also

18   serves as a platform to purchase and sell illegal substances.

19

20    70.    Below is a posting offering for sale and prices of illegal and controlled

21   substances such as LSD, acid, and cocaine pills.

22   //

23   //

24   //

25   //

26   //

27   //

28

1

2

3

4

5

6

7

8

9

10

```
1 ounce cost $450

25) 1 sheet LSD containing 100 shits
150ug for $175
200ug for $220
300ug for $250

26) ecstasy
$8 per pill minimum order is 50pills

27) molly
110$ per gram minimum order is 3g

28) Zopiclone 10mg 1k €400

Get the best deals Pill/drugs for sale
1) subutex 2mg (sublingual tabs)
30 tabs $110
90 tabs $300
2) Roxicodone 30mg (PHYSICIANS TC)100 tabs $200
Roxicodone 30mg (PHYSICIANS TC)
120 tabs $230
4) RITALIN 10mg 100 pill $115
RITALIN 10mg 200 pill $215
5) Ketamine (Ketamine Hydrochloride) - Infar 100mg/ml
Solution 10ml vial $70
6) Ketalar 50mg/ml 10ML Injection $65
7)Demerol 50mg/ml 30ml ampul $42
8) Dilaudid 2mg/100tabs $115
DILAUDID 4mg/100tabs $128
DILAUDID 8mg/100tabs $197
8) SOMA -generic- 350mg 30 tabs 67us$
```

11

12

13

14

71.     Telegram, as a platform, is continuing to grow. As of January 12, 2020, at 12:20, Telegram surpassed 500 million active users. In the past 72 hours alone, more than 25 million new users worldwide joined Telegram.[29]

15

16

17

**FIRST CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**

18

19

20

72.     The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

21

22

73.     Defendant owes a duty of reasonable care to ensure that their services are not used as a means to inflict religious and racial intimidation.

23

24

74.     Defendant currently offers the Telegram app on the Google Play Store.

25

26

75.     Telegram hosts many users who openly identify as Neo-Nazis and White Supremacists.

27

28

---

[29] Posting showing user stats, https://t.me/OhioProudBoys/864

76.    The Telegram app has been used on numerous occasions by White Supremacists and Neo-Nazis to plan, incite and implement anti-Semitic terror plots.

77.    Neo-Nazi and White Supremacists used the Telegram app to coordinate a campaign to spread misinformation during the summer 2020 Black Lives Matter protests.  The goal of this misinformation campaign was to foment African American on Jewish violence.

78.    Because Android devices some of the most popular brands of smartphones in the world, it is reasonable to infer that a substantial number of individuals that used the Telegram app to foment racial terror did so by downloading the app from the Google Play Store.

79.    Telegram has become so well known as a source of racial terror plots that the app is often referred to as "Terrorgram." Because of this high level of notoriety, Defendant Google knew or should have known their Google Play Store was being used to download the Telegram app for terroristic purposes.

80.    Defendant breached their duty by continuing to host Telegram on the Google Play Store despite Defendant's knowledge that Telegram was being used to incite violence, including violence against African Americans and Jews.

81.    Ambassador Ginsberg is a Jewish person whose professional work requires him to maintain a presence in the public eye.

82.    As a result of this Anti-Semitic campaign coordinated on the Telegram app, Ambassador Ginsberg is forced to live in apprehension of religiously motivated violence being perpetrated against him.

83.    Ambassador Ginsberg's fear of religious violence has caused him substantial emotional harm, including depression and anxiety.

84.    Despite having an awareness of the racial and religious incitement planned, coordinated, and implemented through Telegram, Defendant continues to host Telegram on the Google Play Store.

85.     By continuing to host Telegram on the Google Play Store, Defendant facilitates religious threats against him and his family that has caused Ambassador Ginsberg to fear for his life.

86.    It was foreseeable to Google that by allowing Telegram to continue to be available on the Google Play Store, Google's conduct could lead to fear of violence by individuals, such as Ambassador Ginsberg.

87.    By failing to remove Telegram from the Google Play Store, Defendant has proximately caused Ambassador Ginsberg's emotional distress.

88.    Plaintiff Ambassador Ginsberg has suffered injuries in an amount that exceeds $75,000.

1

2            **SECOND CAUSE OF ACTION**

3 **(Violation of the "Unfair" Prong of the UCL, California Business and**
4           **Professions Code §  17200 *et seq.*)**

5     89.    The allegations set forth in all previous paragraphs of the complaint are

6 incorporated by reference as if fully set forth herein.

7
8     90.    The UCL defines unfair business competition to include any "unlawful,

9 unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or

10 misleading" advertising. Cal. Bus. & Prof. Code § 17200.

11
12     91.    A business act or practice is "unfair" under the UCL if the reasons,

13 justifications, and motives of the alleged wrongdoer are outweighed by the gravity

14 of the harm to the alleged victims.

15
16     92.    Defendant's App developer guidelines forbid the following content

17 from the Google Play Store[30]:

18
19 - **Hate Speech**: We don't allow apps that promote violence, or incite hatred
20 against individuals or groups based on race or ethnic origin, religion, disability,
age, nationality, veteran status, sexual orientation, gender, gender identity, or
any other characteristic that is associated with systemic discrimination or
21 marginalization. Apps which contain EDSA (Educational, Documentary,
22 Scientific, or Artistic) content related to Nazis may be blocked in certain
countries, in accordance with local laws and regulations.
23     o Here are examples of common violations: Content or speech asserting
24        that a protected group is inhuman, inferior or worthy of being hated.
25           ▪ Apps that contain hateful slurs, stereotypes, or theories about a
26             protected group possessing negative characteristics (e.g.
malicious, corrupt, evil, etc.), or explicitly or implicitly claims the
27             group is a threat.

28 [30] *See* Exhibit "A"

- ▪ Content or speech trying to encourage others to believe that people should be hated or discriminated against because they are a member of a protected group.
- ▪ Content which promotes hate symbols such as flags, symbols, insignias, paraphernalia or behaviors associated with hate groups.

- **Violence:** We don't allow apps that depict or facilitate gratuitous violence or other dangerous activities. Apps that depict fictional violence in the context of a game, such as cartoons, hunting or fishing, are generally allowed.
  - ○ Here are some examples of common violations:
    - ▪ Graphic depictions or descriptions of realistic violence or violent threats to any person or animal.

- **Terrorist Content:** We do not permit terrorist organizations to publish apps on Google Play for any purpose, including recruitment. We don't allow apps with content related to terrorism, such as content that promotes terrorist acts, incites violence, or celebrates terrorist attacks. If posting content related to terrorism for an educational, documentary, scientific, or artistic purpose, be mindful to provide enough information so users understand the context.

- **Marijuana:** We don't allow apps that facilitate the sale of marijuana or marijuana products, regardless of legality.
  - ○ Here are some examples of common violations:
    - ▪ Allowing users to order marijuana through an in-app shopping cart feature.
    - ▪ Assisting users in arranging delivery or pick up of marijuana.
    - ▪ Facilitating the sale of products containing THC (Tetrahydrocannabinol), including products such as CBD oils containing THC.

93.    Google's guidelines on User Generated Content are as follows:[31]

- User-generated content (UGC) is content that users contribute to an app, and which is visible to or accessible by at least a subset of the app's users. Apps that contain or feature UGC must:
  - ○ require that users accept the app's terms of use and/or user policy before users can create or upload UGC;
  - ○ define objectionable content and behaviors (in a way that complies with Play's Developer Program Policies), and prohibit them in the app's terms of use or user policies;
  - ○ implement robust, effective and ongoing UGC moderation, as is reasonable and consistent with the type of UGC hosted by the app

---

[31] Exhibit "C"

- In the case of live-streaming apps, objectionable UGC must be removed as close to real-time as reasonably possible;
  - provide a user-friendly, in-app system for reporting objectionable UGC and take action against that UGC where appropriate;
  - remove or block abusive users who violate the app's terms of use and/or user policy;
  - provide safeguards to prevent in-app monetization from encouraging objectionable user behavior.
- Apps whose primary purpose is featuring objectionable UGC will be removed from Google Play. Similarly, apps that end up being used primarily for hosting objectionable UGC, or that develop a reputation among users of being a place where such content thrives, will also be removed from Google Play.

94. Thus, Defendant has full managerial discretion to remove apps that violate the aforementioned guidelines.

95. In the past, Google Play has removed applications such as Parler from the Google Play Store for violating these guidelines.

96. Telegram users have repeatedly and systematically utilized the platform to violate Defendant's app developer guidelines since Telegram's launch in 2013. Such violations include, but are not limited to:

- Generating and distributing content expressing degradation and hatred of various racial and religious groups, particularly African Americans and Jewish people.
- Generating and distributing content that contains explicit exhortations to commit violence against various racial and religious groups, particularly African Americans and Jewish people.
- Planning and recruiting participants for acts of racial and religious based terrorism.
- Planning and recruiting participants in terrorist operations aimed at undermining the institution of United States

elections and overturning the results of the 2020 United States Presidential election.

- Providing logistical support for participants of acts of terrorism.

97.    The developers of Telegram have not undertaken any meaningful actions to curb these flagrant, systematic, and continuous violations of Defendant's app guidelines by Telegram users.

98.    The aforementioned violations of Defendant's app guidelines are well known and have been widely reported by international media outlets since 2013. Defendant is therefore aware of Telegram's breaches of their app guidelines.

99.    Despite having an awareness of Telegram's violations of the Google app guidelines, Defendant has not removed Telegram from the Google Play Store, nor has it undertaken any action to compel Telegram to come into compliance with the app guidelines.

100.   Defendant directly benefits from Telegram through information sharing agreements, advertising revenue, and sales of devices to run Telegram.

101.   Ambassador Ginsberg purchased and uses a Samsung Galaxy Express for personal and professional purposes related to his work for CSW.  Ambassador Ginsberg is to be reimbursed for all phone and data costs associated with his work with CSW.

102.   Ambassador Ginsberg premised his purchase and use of a Samsung Galaxy Express for personal and CSW purposes on an expectation that Defendant would enforce their app guidelines.

103.   Defendant has violated the "unfair" prong of the UCL by not following their own policies and allowing Telegram to be downloaded despite the aforementioned violations of Google's guidelines.

104.   These acts and practices were unfair because they caused Ambassador Ginsberg to falsely believe that Google would comply with its own policies and terms of service.  As a result, reasonable consumers, including Ambassador Ginsberg, were induced, in part, to purchase Google's products believing that Google would not allow Telegram on the Google Play Store once becoming aware of the extent of Telegram's use violating Google's policies and guidelines.

105.   Defendant's failure to enforce their own guidelines against Telegram has caused Ambassador Ginsberg and CSW to suffer economic loss by being deprived of a key benefit of the purchase and use of the Samsung Galaxy Express.

106.   The gravity of the harm to Ambassador Ginsberg and members of the public resulting from these unfair acts and practices outweighed any conceivable reasons, justifications, and/or motives of Google for engaging in such unfair acts and practices. By committing the acts and practices alleged above, Google engaged in unfair business practices within the meaning of California Business & Professions Code §§ 17200, *et seq*.

107.   Plaintiffs therefore seek injunctive relief pursuant to California Business and Professions Code § 17203 to enjoin Defendant Google to comply with its own policies and guidelines requiring Telegram to cease and desist violations or remove Telegram from the Google Play Store.

108.   Furthermore, through its unfair acts and practices, Defendant has improperly obtained money from Ambassador Ginsberg. As such, Plaintiff requests that this Court enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Ambassador Ginsberg and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## THIRD CAUSE OF ACTION
**(Violation of the "Unlawful" Prong of the UCL, California Business and Professions Code § 17200 *et seq.*)**

109.   The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

110.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

111.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

112.   California Penal Code § 422.6 states:

No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States [on basis of any recognized protected class such as race or religion].

113.   Users of Telegram have repeatedly and consistently used the app to plan and format racially motivated terrorist plots.

114.   Many of the Telegram users who have used the app for terroristic purposes have downloaded the app on the Google Play Store so that they may violate California Penal Code § 422.6.

115.   Google is aware that a substantial number of Telegram users use the application in violation of California Penal Code § 422.6.

116.   Despite knowing that Telegram is being used to commit criminal acts, Google continues to allow Telegram to be downloaded from the Google Play Store. Thus, Google's conduct aids and abets the commission of criminal acts and is itself a violation of California Penal Code § 31 and is a violation of the "unlawful" prong of the UCL.

117.   Because of its unlawful acts and practices, Plaintiff requests that this Court enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Ambassador Ginsberg and

members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Enter judgment against Defendants and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial.

(b)     Enter judgment against Defendants and in favor of each Plaintiff for an injunction prohibiting the availability of Telegram through the Google Play Store unless Telegram complies with Google's policies and guidelines.

(c)     Enter judgment against Defendants and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees.

(d)     Grant such other and further relief as justice requires.

### JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully Submitted,

Lento Law Group P.C.

Dated:      January 25, 2021          By:   */s/ Keith Altman*
            Farmington Hills, MI            Keith Altman (SBN 257309)
                                            3000 Atrium Way - Suite #200
                                            Mt. Laurel, New Jersey 08054
                                            (516) 456-5885

kaltman@lentolawgroup.com

*Attorneys for Plaintiffs*